IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2025 Term

_____

No. 21-1033

_____

FILED
June 10, 2025

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE: EDWARD R. KOHOUT PETITION FOR REINSTATEMENT

_____

Lawyer Disciplinary Proceeding

REINSTATEMENT DENIED

_____

Submitted: March 4, 2025
Filed: June 10, 2025

Edward R. Kohout
Self-Represented Litigant
Point Marion, Pennsylvania
Petitioner

Rachel L. Fletcher Cipoletti, Esq.
Chief Lawyer Disciplinary Counsel
Kristin P. Halkias, Esq.
Lawyer Disciplinary Counsel
Office of Lawyer Disciplinary Counsel
Charleston, West Virginia
Attorneys for the Respondent

JUSTICE BUNN delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.    "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syllabus point 1, *In re Reinstatement of Wheaton*, 245 W. Va. 199, 858 S.E.2d 662 (2021) (quoting Syllabus point 3, *Committee on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984)).

2.    "A *de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee of the Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Hearing Panel Subcommittee's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Hearing Panel Subcommittee's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syllabus point 3, *Committee on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

3.    "The general rule for reinstatement is that a disbarred attorney in order to regain admission to the practice of law bears the burden of showing that he presently

possesses the integrity, moral character and legal competence to resume the practice of law. To overcome the adverse effect of the previous disbarment, [the disbarred attorney] must demonstrate a record of rehabilitation. In addition, the [C]ourt must conclude that such reinstatement will not have a justifiable and substantial adverse effect on the public confidence in the administration of justice and in this regard the seriousness of the conduct leading to disbarment is an important consideration." Syllabus point 1, *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (1980).

4.       A disbarred lawyer petitioning for reinstatement of an annulled license to practice law must prove the criteria identified in Syllabus point 1 of *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (1980), by clear and convincing evidence.

5.       "Rehabilitation is demonstrated by a course of conduct that enables the [C]ourt to conclude there is little likelihood that[,] after such rehabilitation is completed and the applicant is readmitted to the practice of law[,] he will engage in unprofessional conduct." Syllabus point 4, *In re Reinstatement of Wheaton*, 245 W. Va. 199, 858 S.E.2d 662 (2021) (quoting Syllabus point 2, *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (1980)).

**BUNN, Justice:**

Petitioner, Edward R. Kohout, seeks reinstatement of his license to practice law in West Virginia, which this Court annulled in 2016 based on Mr. Kohout's serious misconduct that included converting client funds, submitting a fraudulent invoice, and establishing a pattern of intentional deceit and dishonesty as evident from his disciplinary record.[1] Because of the nature of his misconduct, Mr. Kohout bears a heavy burden to prove that he now possesses the integrity, high moral character, and legal competence to justify reinstating his law license. We find that Mr. Kohout has failed to meet his burden. Due to the lack of clear and convincing evidence permitting us to conclude that Mr. Kohout's reinstatement will not have a substantial adverse effect on the public confidence in the administration of justice, we deny his petition for reinstatement. Furthermore, before filing another petition for reinstatement, Mr. Kohout must: (1) fully reimburse the Disciplinary Board for the cost of the disciplinary proceeding in which he was disbarred; (2) fully reimburse the Disciplinary Board for the cost of this reinstatement proceeding; and (3) obtain an affidavit from a licensed attorney agreeing to supervise him upon reinstatement, which he must include with any future petition for reinstatement he may file.

---

[1] We note that, "disbarment of an attorney and annulment of his license are two ways of expressing the same form of punishment. The annulment of a license to practice law constitutes a disbarment. Annulment relates to the license and disbarment refers to the individual." Syl. pt. 2, in part, *Comm. on Legal Ethics v. Boettner*, 188 W. Va. 1, 422 S.E.2d 478 (1992).

1

# I.

## FACTUAL AND PROCEDURAL HISTORY

Mr. Kohout was admitted to the practice of law in West Virginia on November 4, 1987. On September 23, 2015, the Investigative Panel of the Lawyer Disciplinary Board ("Disciplinary Board") issued a four-count statement of charges based on four separate complaints against Mr. Kohout. The Hearing Panel Subcommittee of the Disciplinary Board ("Hearing Panel") held a two-day hearing. Based on the evidence presented, the Hearing Panel submitted its findings and recommendations to this Court recommending that we annul Mr. Kohout's law license, require him to make restitution to one of the complainants, and require him to pay the costs of the disciplinary proceeding. Mr. Kohout objected to the recommended disposition, and the Court scheduled the matter for briefing and oral argument.

Afterward, the Court agreed with the Hearing Panel's recommendation and, on November 15, 2016, issued an opinion disbarring Mr. Kohout. *Law. Disciplinary Bd. v. Kohout* ("*Kohout Disbarment*"), 238 W. Va. 668, 798 S.E.2d 192 (2016). We found that the Office of Disciplinary Counsel ("ODC") failed to prove, by clear and convincing evidence, allegations related to a complaint made by Mr. Kohout's former secretary. *Id*. at 684, 798 S.E.2d at 208. However, the three remaining complaints were supported by clear and convincing proof that Mr. Kohout committed fifteen different acts that violated eleven different provisions of the West Virginia Rules of Professional

2

Conduct.[2] *Id*. Notably, in each of the three remaining complaints, the Court found that Mr.

Kohout engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation,

which amounted to four separate violations of Rule 8.4(c). *Id.*; s*ee also* W. Va. R. Prof.

Conduct 8.4(c) ("It is professional misconduct for a lawyer to: . . . engage in conduct

involving dishonesty, fraud, deceit or misrepresentation[.]"). Numerous aggravating

circumstances impacted the Court's disciplinary decision, including:

> (1) Mr. Kohout's list of prior disciplinary offenses, one of which necessitated suspension of Mr. Kohout's law license for two years;[3] (2) his dishonest and/or selfish motive; (3) the extensive number of Rule violations; (4) a pattern of

---

[2] Several of Mr. Kohout's actions violated multiple rule provisions. Thus, the ODC proved a total of twenty-eight violations.

[3] Mr. Kohout's prior lawyer disciplinary offenses relied on by the Court include several disciplinary proceedings. In 1992, the Bankruptcy Court for the Northern District of West Virginia suspended his privilege to practice in that court for three years after finding that Mr. Kohout "engaged in an intentional series of improper acts planned and directed by [Mr. Kohout] to benefit [his bankruptcy client and the client's] family and associates." *Law. Disciplinary Bd. v. Kohout*, No. 22629, at 5 (W. Va. Apr. 14, 1995) (unpublished per curiam). This Court suspended Mr. Kohout's law license for two years in 1995 because he "(1) made a materially false statement" when he applied for admission to the West Virginia State Bar; "(2) engaged in conduct involving dishonesty, fraud, deceit, or other misrepresentation," by repeatedly concealing the fact of disciplinary punishment imposed on Mr. Kohout when he was a law student; and (3) was suspended by the bankruptcy court. *Id.* at 6. *See also id.* at 8 (finding Mr. Kohout "engaged in serious ethical misconduct and has demonstrated a pattern of conduct involving intentional deception"). The Supreme Court of Pennsylvania suspended Mr. Kohout's Pennsylvania law license for three years as reciprocal discipline for the suspension of his West Virginia law license. *See In re Kohout*, 664 A.2d 1309 (Pa. 1995) (per curiam mem.). In 2013, the Disciplinary Board admonished Mr. Kohout for misleading a family court about the status of a personal injury settlement his client received. *Kohout*, No. 10-01-198 (Investigative Panel, Lawyer Disciplinary Bd. May 6, 2013) (admonishment and closing order). *See also Law. Disciplinary Bd. v. Kohout* ("*Kohout Disbarment*"), 238 W. Va. 668, 681, 798 S.E.2d 192, 205 (2016) (acknowledging admonishment).

misconduct as established by his prior discipline and the present Rule violations; (5) refusal to acknowledge the wrongful nature of his conduct or the extent of the harm caused by his conduct; (6) his substantial experience in the practice of law; and (7) his indifference to making restitution.

*Kohout Disbarment*, 238 W. Va. at 686, 798 S.E.2d at 210. An additional aggravating factor recognized by the Court was a contemporaneous disciplinary action against Mr. Kohout by the Judicial Investigation Commission. *See In re Kohout*, No. 15-1190 (W. Va. October 7, 2016) (unpublished order).[4] Finding no mitigating factors, we annulled Mr. Kohout's law license and ordered him to "make full restitution to [his client] in the amount of $2,059.66, and . . . reimburse the [Disciplinary Board] for the costs it incurred in connection with these proceedings." *Kohout Disbarment*, 238 W. Va. at 687, 798 S.E.2d at 211 (footnote omitted). The Court's mandate issued on December 15, 2016, reiterating

---

[4] In the Judicial Investigation Commission proceeding, the Court adopted recommendations by the Judicial Hearing Board and accepted the parties' joint stipulations providing that Mr. Kohout violated multiple canons of the Code of Judicial Conduct while he was a candidate for circuit court judge. *In re Kohout*, No. 15-1190 (W. Va. October 7, 2016) (unpublished order). We also adopted the parties' joint recommendations on discipline. *Id.* Accordingly, we publicly censured Mr. Kohout, ordered that he be permanently enjoined from seeking judicial office by election or appointment in West Virginia, and ordered him to pay the costs of the investigation and prosecution of the charges. *Id.* As of January 28, 2016, those costs equaled $3,307.95. *Id.* We ordered Mr. Kohout to make $200.00 monthly payments beginning thirty days after the conclusion of the proceedings. *Id.* During his reinstatement hearing before the Hearing Panel in the instant matter, Mr. Kohout claimed that Judicial Disciplinary Counsel forced the stipulation on him by threatening disbarment, and he admitted that he had made no payments toward the costs incurred in investigating and prosecuting the Judicial Investigation Commission proceeding.

that Mr. Kohout make full restitution to Ms. Richard and noting that the costs of the proceedings Mr. Kohout owed the ODC totaled $10,737.77.

In addition to the obligations the Court imposed on Mr. Kohout in the annulment proceeding, West Virginia Rule of Lawyer Disciplinary Procedure 3.28 required him to notify his clients of his disbarment. Pursuant to Rule 3.28(c), Mr. Kohout had a mandatory duty to file an affidavit with this Court no more than twenty days after the effective date of his disbarment, providing specified information about each client he notified in accordance with paragraphs (a) and (b) of the rule. Mr. Kohout missed the twenty-day deadline. He did not file the affidavit until May 18, 2020–nearly three-and-a-half years after his disbarment. Then, Mr. Kohout waited almost five years after his disbarment before paying $2,060.00 in restitution to his client as ordered by this Court. *See Kohout Disbarment*, 238 W. Va. at 687, 798 S.E.2d at 211 (ordering Mr. Kohout to make full restitution).[5]

Pursuant to West Virginia Rule of Lawyer Disciplinary Procedure 3.33(b), Mr. Kohout was permitted to petition for reinstatement five years after the annulment of

---

[5] Mr. Kohout paid the ordered restitution on September 21, 2021. This was nearly eight years after the October 30, 2013, settlement of his client's personal injury case.

his license.[6] Toward the end of this five-year period, around December 14, 2021, Mr. Kohout contacted the ODC about paying the costs of his disciplinary proceeding. By letter dated and faxed on December 16, 2021, Mr. Kohout advised the ODC that he would "be filing [his] petition for reinstatement soon and would like to propose a payment plan for the repayment of the costs of [his] proceeding." He proposed monthly payments of $300.00 for thirty-six months. That same day, the ODC prepared a payment plan agreement providing for "monthly installments of $300.00, to be paid the first week of each month," and sent it to Mr. Kohout.

---

[6] West Virginia Rule of Lawyer Disciplinary Procedure 3.33(b) provides:

> After the expiration of five years from the date of disbarment, a person whose license to practice law has been or shall be annulled in this State and who shall desire reinstatement of such license may file a verified petition in the Supreme Court of Appeals reciting the cause of such annulment and what the person shall have done in satisfaction of requirements as to rehabilitation, restitution, conditions or other acts incident thereto, by reason of which the person should be reinstated as a member of the state bar and his or her license to practice law restored. The petitioner shall also file a completed reinstatement questionnaire provided by the Office of Disciplinary Counsel. At the time of filing the petition and questionnaire with the Clerk of the Supreme Court of Appeals, the petitioner shall also file a copy of each with the Office of Disciplinary Counsel, which shall conduct a prompt investigation thereof and shall file a report with a Hearing Panel Subcommittee of the Lawyer Disciplinary Board.

The next day, December 17, 2021, Mr. Kohout filed his petition seeking reinstatement along with the reinstatement questionnaire required by Rule 3.33(b).[7] The ODC received copy of Mr. Kohout's signed payment plan agreement on December 22, 2021. Mr. Kohout's initial two $300.00 payments were not delivered to the ODC until February and March of 2022. He then paid only $100 in April 2022, explaining that a temporary interruption of his Social Security benefits had disrupted his finances. Thereafter, Mr. Kohout made sporadic $100 payments. As of March 4, 2025, when this case was submitted after oral arguments, it appears that Mr. Kohout had paid approximately $1,500.00 of the $10,737.77 cost of the disciplinary proceeding that resulted in his disbarment.[8]

Meanwhile, after Mr. Kohout filed his petition for reinstatement, the ODC requested public comments on Mr. Kohout's reinstatement. One letter responding to this request was written in January 2022 by Mr. Nestor Hernandez. He stated that Mr. Kohout had served four years as the recording secretary for a gun club both men belong to. Mr. Hernandez explained that he was the treasurer for the club and had known Mr. Kohout for

---

[7] *See Id.* Mr. Kohout did not fully complete the questionnaire, omitting the list of the offenses or misconduct that led to his disbarment as well as the related information and documentation identified in the questionnaire.

[8] Documents in the record reflecting Mr. Kohout's payments are incomplete, so this amount is an estimate. However, it is undisputed that Mr. Kohout has failed to pay the full amount owed to the ODC as ordered by this Court.

more than five years. Mr. Hernandez credited Mr. Kohout with "guiding and assisting" the gun club to obtain its non-profit status and helping to improve the club's by-laws and dues collection. He wrote that Mr. Kohout "was key in helping the club get back on its feet to continue [its] existence" after a former treasurer embezzled club funds. Mr. Hernandez described Mr. Kohout as honest, trustworthy, hardworking, and of good moral character, further stating that Mr. Kohout ensures "things" are "within the scope of the law." Lastly, he stated that Mr. Kohout helps to organize events, keeps "excellent meeting minutes and records," and helps other club officers when needed. Mr. Lawrence Mikolajcik, then president of the insurance sales company for which Mr. Kohout worked as an independent contractor, also submitted a letter. The letter explained that Mr. Kohout began selling insurance though the company in late 2016, and he "has conducted himself in a professional manner under minimal supervision. Overall, he has kept his account in a good financial position. We have not received any negative feedback from clients and in general would judge his conduct as satisfactory."[9]

---

[9] The information provided by Mr. Hernandez and Mr. Kohout's employer occurred after Mr. Kohout's disbarment. Other letters responding to the ODC's request for comments, both in favor of and opposing Mr. Kohout's reinstatement, are largely related to his pre-disbarment conduct, or they are general statements to which we give little weight. *See In re Reinstatement of Drake*, 242 W. Va. 65, 71 n.20, 829 S.E.2d 267 273 n.20 (2019) ("General statements and letters from attorneys, friends, and community leaders on behalf of a petitioner in a reinstatement proceeding are of little evidentiary value." (quoting *Law. Disciplinary Bd. v. Vieweg*, 194 W. Va. 554, 559, 461 S.E.2d 60, 65 (1995))). Therefore, we do not discuss the contents of those letters.

The ODC also conducted an investigation and, on March 26, 2024, filed an amended report regarding Mr. Kohout's petition for reinstatement.[10] The Hearing Panel then held a reinstatement hearing in this matter on May 17, 2024.[11] At the beginning of the hearing, the ODC and Mr. Kohout submitted proposed exhibits. The Hearing Panel admitted all the exhibits into evidence without objection. Seven witnesses testified. Mr. Kohout offered testimony by Chad Mikolajcik, president of the insurance sales company employing Mr. Kohout as an independent contractor;[12] Linda Cummins, a former client and insurance customer; and Diane Kohout, his wife. Mr. Kohout also testified on his own behalf.

Mr. Mikolajcik explained that he is president of Insurance Services, LLC., and Mr. Kohout is a licensed insurance agent who has sold life and health insurance through Mr. Mikolajcik's company on a commission basis with little supervision, since late 2016. He described Mr. Kohout as professional and friendly, a person who kept his account in a

---

[10] *See* W. Va. R. Law. Disciplinary P. 3.33(b) (requiring the ODC to "conduct a prompt investigation" of the petition for reinstatement and reinstatement questionnaire and "file a report with a Hearing Panel Subcommittee of the Lawyer Disciplinary Board," and quoted *supra* at note 6).

[11] *See Id.* at 3.33(c) (directing the Hearing Panel to, upon receiving the ODC's report, schedule a hearing and promptly prepare a written report with its recommendation).

[12] Chad Mikolajcik apparently replaced his father, Lawrence Mikolajcik, as president of the insurance sales company.

good financial position and generally received no negative feedback. According to Mr. Mikolajcik, Mr. Kohout has written more than 500 policy applications in the seven-and-a-half-years they have worked together. Mr. Kohout has annually completed Medicare fraud, waste, and abuse training to maintain his certification to sell Medicare supplemental plans, and he won sales awards once or twice.[13] Mr. Mikolajcik explained that Mr. Kohout does not handle client money, and if he received a check from a client, it would be made out to the insurance company and not to Mr. Kohout. Finally, Mr. Mikolajcik stated that he had observed nothing to suggest Mr. Kohout was not fit to resume the practice of law, but qualified his statement by acknowledging that he is unfamiliar with "that regulatory landscape."

Linda Cummins explained that Mr. Kohout represented her in a discrimination/wrongful discharge case against Monongalia General Hospital in 2013. Her case settled because it was "cut and dried pretty much," she was "absolutely" satisfied with the representation Mr. Kohout provided, and she trusted him implicitly. Because of her trust, she also sought Mr. Kohout's advice about insurance. Ms. Cummins stated that Mr. Kohout never said or did anything to make others feel uncomfortable. Although she did not understand why Mr. Kohout was disbarred, she opined that he should be reinstated

---

[13] In 2018 Mr. Kohout received an "Aetna Medicare Front Runner producer" certificate and a "Tycoon Club" award from Insurance Services, LLC, for outstanding sales achievement.

10

immediately.[14] When the ODC's counsel posed a hypothetical describing some of Mr. Kohout's professional misconduct, Ms. Cummins declared that she would not believe Mr. Kohout committed those offenses.

Diane Kohout, Mr. Kohout's wife, testified by reading a prepared statement, but she sometimes strayed from it.[15] She and Mr. Kohout married in 2013. Ms. Kohout is

---

[14] We have expressed concern when personal opinions about a disbarred lawyer's character or legal competence are provided by persons who do not fully understand the offenses underlying the disbarment. *See Drake*, 242 W. Va. at 71, 829 S.E.2d at 273 ("We are deeply concerned . . . that none of those who testified had a full understanding of the underlying offense."). Because Ms. Cummings did not have a clear understanding of the offenses that led to Mr. Kohout's disbarment, we give little weight to the character testimony she offered on Mr. Kohout's behalf.

[15] The ODC points out that during her testimony, Ms. Kohout commented that she was "getting a little off script," and when referring to the written statement said "[l]et's see. What else did he say?" and "let's see what else he put down." To the extent that the ODC implies that these comments cast doubt on Ms. Kohout's credibility, we note that during the ODC's cross-examination, counsel asked if Mr. Kohout had prepared the statement. Ms. Kohout responded "No, ma'am. I—I wrote this." She then explained that she wrote the statement and Mr. Kohout typed it for her, then they went through it together and "tweaked it a little bit." Furthermore, the Hearing Panel's findings and recommendations to this Court contain no finding with respect to Ms. Kohout's credibility, and we will not make such a determination on a cold record. *See Law. Disciplinary Bd. v. Cunningham*, 195 W. Va. 27, 34, 464 S.E.2d 181, 188 (1995) (acknowledging that the Hearing Panel "hears the testimony of the witnesses firsthand and, being much closer to the pulse of the hearing, is much better situated to resolve such issues as credibility" (quoting *Comm. on Legal Ethics v. McCorkle*, 192 W. Va. 286, 290, 452 S.E.2d 377, 381 (1994))); *Frazier v. Ramadan*, 249 W. Va. 170, 181, 895 S.E.2d 25, 36 (2023) ("Our law is clear that '[a] reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations[,] and this Court is not in a position to, and will not, second guess such determinations.'" (quoting *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997))).

a retired registered nurse and believes herself to be a good judge of character. She described Mr. Kohout as likable, intelligent, articulate, and truthful, saying they have had a "very, very happy marriage." Nevertheless, Mr. Kohout's disbarment has disrupted their lives and has made Mr. Kohout unhappy since he is unable to engage in his chosen vocation, and it has strained their marriage.[16] Even though Mr. Kohout works hard as an insurance agent and makes a good living, they have both begun drawing Social Security benefits and struggle financially every month. When questioned about Mr. Kohout's past disciplinary issues, Ms. Kohout explained that she knew about a couple of Mr. Kohout's early offenses, but she knew few details about the 1995 disciplinary action or the 2015 Judicial Investigation Commission proceeding, and she did not know that a bankruptcy court had temporarily suspended Mr. Kohout's privilege to practice in that court in 1995.[17] Ms. Kohout described Mr. Kohout's clients as "mostly poor people" and "many that didn't pay for his services." However, she indicated that she would like to see Mr. Kohout's license reinstated because he is a talented and dedicated lawyer who cares about his clients and is happiest when he is helping people. Regarding Mr. Kohout's rehabilitation, Ms. Kohout

---

[16] In his brief to this Court, Mr. Kohout states that Ms. Kohout left him to return to her home state shortly after the May 17, 2024 hearing.

[17] Ms. Kohout was not questioned about her understanding of Mr. Kohout's misconduct that led to his disbarment. Because we cannot determine whether Ms. Kohout had a clear understanding of the offenses that led to Mr. Kohout's disbarment, and her knowledge of his disciplinary history was limited, we give little weight to the character testimony she offered on his behalf. *See* note 14 *supra*.

stated that, since his disbarment, Mr. Kohout has not sought counseling or taken any classes on law office management. She believed he could benefit from both.

Mr. Kohout testified at length. His primary theme was that "all this ethics case is about" is the fact that his "money ran out." As discussed more thoroughly below, although he expressed remorse and stated that he accepted full responsibility "for this ethics [c]ase," Mr. Kohout repeatedly defended his conduct and refuted this Court's conclusions about the misconduct that led to his disbarment. Addressing restitution, Mr. Kohout explained that he had paid the debts related to some of the offenses for which he was disbarred, including a $985 medical bill he owed on behalf of a client,[18] a $200 filing fee for an appeal in this Court,[19] and $2,060 he owed to a client for settlement funds he converted to his own use.[20] On the topic of rehabilitation, Mr. Kohout relied upon his seven-and-one-half years of "successfully" selling insurance without complaints. He asserted there is "little likelihood of reoccurrence" as there are "no prior similar

---

[18] In fact, Mr. Kohout paid this bill before the Court annulled his law license. *See Kohout Disbarment*, 238 W. Va. at 679, 798 S.E.2d at 203 ("In October 2015, Mr. Kohout contacted Dynamic Physical Therapy about paying Ms. Richard's bill. He paid the bill in December 2015.").

[19] Mr. Kohout also made this payment prior to the annulment of his law license. *See id.* at 673, 798 S.E.2d at 197 (acknowledging that the filing fee was received in January 2014).

[20] Mr. Kohout explained that his son provided the money used to pay this client.

occurrences" and this "is the first time [he has] been accused of conversion or anything like that." He has not participated in any counseling since his disbarment and stated that he had previously done so and did not see the point. Mr. Kohout gave detailed testimony about clients he represented in the past and how he helped people. During his cross examination by the ODC, Mr. Kohout became defensive and uncooperative. He did not want to discuss his disciplinary history, which was the primary focus of the cross-examination.[21]

Following the hearing, the Hearing Panel filed its "Findings and Recommendations" regarding Mr. Kohout's petition for reinstatement, recommending that this Court deny Mr. Kohout's petition. Because Mr. Kohout testified that he would "be back every year" if he must, to get his law license reinstated, the Hearing Panel further recommends that the Court order Mr. Kohout to pay the entire cost of his underlying disciplinary proceeding before filing another petition for reinstatement.[22] Finally, the Hearing Panel asks that the Court further direct Mr. Kohout to provide an affidavit from a licensed attorney agreeing to supervise him upon reinstatement with any future petition for

---

[21] The ODC offered testimony by a panel trustee for the United States Bankruptcy Court for the Northern District of West Virginia, and two of Mr. Kohout's former employees. These witnesses testified about Mr. Kohout's pre-disbarment character and conduct. Because we do not rely on this evidence in reaching our decision on Mr. Kohout's reinstatement, we find no need to summarize this testimony.

[22] *See* W. Va. R. Law. Disciplinary P. 3.33(g) (permitting conditions concerning subsequent petitions for reinstatement).

14

reinstatement he may file. Mr. Kohout requested a hearing pursuant to Rule 3.33(d), and the Court held oral arguments on March 4, 2025.

## II.

## STANDARD OF REVIEW

"This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. pt. 1, *In re Reinstatement of Wheaton*, 245 W. Va. 199, 858 S.E.2d 662 (2021) (quoting Syl. pt. 3, *Comm. on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984)). This standard encompasses our authority to make the ultimate decision concerning reinstatement. *See, e.g.*, *id.* (applying standard to reinstatement); *In re Reinstatement of diTrapano*, 240 W. Va. 612, 814 S.E.2d 275 (2018) (same). Because we are the final arbiter of legal ethics issues, we exercise de novo review of disciplinary matters, including petitions for reinstatement, while giving substantial deference to the Hearing Panel's findings of fact that are supported by the record and respectfully considering its recommendations:

> A *de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee of the Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Hearing Panel Subcommittee's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Hearing Panel

> Subcommittee's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

Syl. pt. 3, *Comm. on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).[23]

## III.

## DISCUSSION

We first review the general standards applicable to our consideration of a disbarred lawyer's petition for reinstatement, and we clarify that the petitioner's burden of proof for reinstatement is met only by clear and convincing evidence. Thereafter, we evaluate Mr. Kohout's evidence according to the criteria previously established by this Court. As explained below, we conclude that Mr. Kohout has not satisfied his burden.

### A. Standards for Reinstatement

Mr. Kohout bears the burden of proof in this matter. "In reinstatement proceedings, the party seeking reinstatement has the burden of showing that he or she should be permitted to resume the practice of law in West Virginia." *Wheaton*, 245 W. Va. at 204, 858 S.E.2d at 667. This Court has explained that "[i]n reinstatement cases, the fundamental question which the [C]ourt must address is whether the attorney seeking

---

[23] Because our review is de novo, we need not address Mr. Kohout's assertion that the Hearing Panel's findings and recommendations are "contrary to the correct standard for assessing rehabilitation."

reinstatement has shown that he presently possesses the integrity, moral character, and legal competence to assume the practice of law." *Law. Disciplinary Bd. v. Hess*, 201 W. Va. 192, 194, 495 S.E.2d 563, 565 (1997) (per curiam). *See also In re Brown* ("*Brown I*"), 164 W. Va. 234, 237, 262 S.E.2d 444, 446 (1980) ("The ultimate question is whether he possesses the integrity, high moral character and legal competence to justify the reinstatement of his license."). Thus, we have held that

> The general rule for reinstatement is that a disbarred attorney in order to regain admission to the practice of law bears the burden of showing that he presently possesses the integrity, moral character and legal competence to resume the practice of law. To overcome the adverse effect of the previous disbarment, [the disbarred attorney] must demonstrate a record of rehabilitation. In addition, the [C]ourt must conclude that such reinstatement will not have a justifiable and substantial adverse effect on the public confidence in the administration of justice and in this regard the seriousness of the conduct leading to disbarment is an important consideration.

Syl. pt. 1, *In re Brown* ("*Brown II*"), 166 W. Va. 226, 273 S.E.2d 567 (1980).[24] *Accord* Syl. pt. 3, *Wheaton*, 245 W. Va. 199, 858 S.E.2d 662.

These cases establish that Mr. Kohout bears the burden of proof regarding his reinstatement, but they do not explicitly define the standard of proof a disbarred lawyer seeking reinstatement must meet. The Disciplinary Board proposes a standard that requires

---

[24] Because Mr. Kohout bears the burden of proof in this matter, we decline to address his argument that the Hearing Panel's recommendation is not supported by sufficient evidence.

17

the disbarred lawyer to present clear and convincing evidence, as that is the standard for lawyer disciplinary cases and for reinstatement following an administrative suspension.[25] *See* W. Va. R. Law. Disciplinary P. 3.7 ("In order to recommend the imposition of discipline of any lawyer, the allegations of the formal charge must be proved by clear and convincing evidence."); W. Va. R. Law. Disciplinary P. 3.24(a) (providing that a petition for reinstatement of an administratively suspended lawyer pursuant to Rule of Lawyer Disciplinary Procedure 3.23 "shall be granted by the Court upon a showing by clear and convincing evidence that the lawyer's disability has been removed and that the lawyer is fit to resume the practice of law").[26] Mr. Kohout does not address this issue.

We agree with the Disciplinary Board that the same standard used for reinstatement after administrative suspension should be applied when addressing a petition

---

[25] This Court will impose an administrative suspension when it concludes that a lawyer "is disabled from continuing to practice law" due to "mental infirmity or illness or because of addiction to drugs or alcohol[.]" *See* W. Va. R. Law. Disciplinary P. 3.23(a).

[26] *See also* Syl. pt. 1, in part, *Law. Disciplinary Bd. v. McGraw*, 194 W. Va. 788, 461 S.E.2d 850 (1995) ("Rule 3.7 of the Rules of Lawyer Disciplinary Procedure . . . requires the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence."); *Off. of Disciplinary Couns. v. Pitts*, 208 W. Va. 116, 118, 538 S.E.2d 707, 709 (2000) (per curiam) (stating that an administratively suspended lawyer "is required, pursuant to Rule 3.24(a) of the Rules of Lawyer Disciplinary Procedure, to petition this Court for reinstatement of his law license when he can demonstrate by clear and convincing evidence that his disability has been removed and that he is physically fit to resume the practice of law").

18

for reinstatement following annulment.[27] Therefore, we now hold that a disbarred lawyer petitioning for reinstatement of an annulled license to practice law must prove the criteria identified in Syllabus point 1 of *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (1980), by clear and convincing evidence. The Court has identified five factors to inform our decision of whether a disbarred lawyer seeking reinstatement has adequately proven the criteria in Syllabus point 1 of *Brown II*:

> (1) the nature of the original offense for which the petitioner was disbarred, (2) the petitioner's character, maturity, and experience at the time of his disbarment, (3) the petitioner's occupations and conduct in the time since his disbarment, (4) the time elapsed since the disbarment, and (5) the petitioner's present competence in legal skills.

*Brown II*, 166 W. Va. at 229, 273 S.E.2d at 568 (quoting *Brown I*, 164 W. Va. at 237-38, 262 S.E.2d at 446). We consider these factors to evaluate whether Mr. Kohout has met his burden of showing that he now possesses the integrity, moral character, and legal

---

[27] Other courts also apply a clear and convincing standard of proof. *See Nottingham v. People*, 560 P.3d 457, 470 (Colo. O.P.D.J. 2024) ("To be readmitted to the practice of law in Colorado . . . a lawyer must prove by clear and convincing evidence that the lawyer has complied with applicable disciplinary orders and rules, is fit to practice law, and has been rehabilitated."); *In re Kotsogiannis*, 230 A.D.3d 1425, 1426 (N.Y. App. Div. 2024) (per curiam) ("It is well settled that 'every respondent seeking reinstatement from disbarment must establish, by clear and convincing evidence, (1) that he or she has complied with the order of disbarment and the applicable rules of the Court, (2) that he or she possesses the requisite character and fitness for the practice of law, and (3) that his or her reinstatement would be in the public interest'" (quoting *In re Castro*, 200 A.D.3d 1387, 1389 (N.Y. App. Div. 2021) (per curiam))); *In re Reinstatement of Sand*, 951 N.W.2d 918, 925 (Minn. 2020) (per curiam) (reinstating disbarred lawyer and holding that he "met his burden of showing by clear and convincing evidence that he satisfied each of the requirements for reinstatement to the practice of law").

competence to resume the practice of law; demonstrating a record of rehabilitation; and providing sufficient evidence for this Court to conclude that reinstatement will not have a substantial adverse effect on the public confidence in the administration of justice. *See* Syl. pt. 1, *Brown II*, 166 W. Va. 226, 273 S.E.2d 567. "We do not apply these factors mechanically. Rather, they help us determine whether the applicant has made the required showing." *In re Arrotta*, 96 P.3d 213, 216 (Ariz. 2004) (en banc) (applying factors similar to those identified in *Brown II*).[28]

### B. Nature of the Offenses that Led to Mr. Kohout's Disbarment

We have recognized that when "assessing an application for reinstatement," we must consider "the nature of the original offense for which the applicant was disbarred." *Brown II* at 234, 273 S.E.2d at 571. This factor is relevant for several reasons. First, the nature of the underlying misconduct relates to the proof necessary to overcome the previous finding of unfitness to practice law because "the more serious the nature of the underlying offense, the more difficult the task becomes to show a basis for reinstatement." *Id.* at 234,

---

[28] The Disciplinary Board argues that the seriousness of the underlying offenses that led to Mr. Kohout's disbarment precludes his reinstatement. We reject this argument on the same grounds we expressed in *In re Reinstatement of diTrapano*, 240 W. Va. 612, 814 S.E.2d 275 (2018). A rule barring reinstatement for certain conduct "would run counter to the fact-intensive reinstatement inquiry mandated by Syllabus Point 1 of [*Brown II*], which demands analysis of current attributes (integrity, moral character, and legal competence), the record of rehabilitation, and the impact reinstatement would have on our profession." *diTrapano* at 617, 814 S.E.2d at 280. "Moreover, it would unduly constrain the 'independent judgment' that this Court must exercise as the final arbiter of lawyer disciplinary matters." *Id.*

273 S.E.2d at 571. Furthermore, understanding the nature of the underlying offenses allows us to appraise the disbarred lawyer's recognition of his or her misconduct. *See Law. Disciplinary Bd. v. Moore*, 214 W. Va. 780, 788, 591 S.E.2d 338, 346 (2003) (per curiam) (acknowledging that a factor for consideration when a person applies for reinstatement is "the applicant's recognition of his wrongdoing" (emphasis added) (quoting *Lester v. Kentucky Bar Ass'n*, 532 S.W.2d 435, 436 (Ky. 1975) (per curiam))). The applicant's recognition of his or her misconduct is important since "rehabilitation and reformation demand that the individual perceive and reject the wrongfulness of his conduct and show in some positive way that he now has a correct sense of professional responsibility." *Id.* (emphasis omitted) (quoting *In re Peterson*, 274 N.W.2d 922, 926 (Minn.1979) (per curiam)). In the same manner, the nature of the misconduct underlying disbarment provides a useful guide to measure the disbarred lawyer's efforts at rehabilitation, permitting the Court to assess how a disbarred lawyer has focused his or her efforts on addressing the issues that led to disbarment. *See Wheaton*, 245 W. Va. at 205, 858 S.E.2d at 668 (observing that "to evaluate a petitioner's rehabilitation . . . we must consider: (1) the nature of the original offense for which the petitioner was disbarred . . ."); *Arrotta*, 96 P.3d at 217 ("To show rehabilitation, an applicant must first establish by clear and convincing evidence that he has identified just what weaknesses caused the misconduct and then demonstrate that he has overcome those weaknesses.").

21

Mr. Kohout contends that the nature of his underlying offenses weighs in his favor because they all "stemmed from the one fact that [he] ran out of money in the Fall [sic] of 2013." He states that, by contrast, his case is not as serious as, "million dollar bank fraud, or overcharging the Public Defender Services, or converting trust funds,[29] or having sex with clients, or election fraud." Finally Mr. Kohout asserts that the Hearing Panel failed to consider "the glaring exculpatory and laudable fact that [his] solo practice in Morgantown was devoted to serving poor and low-income clients, which led to the shortfall of cash and this ethics case."[30] The Disciplinary Board summarizes the nature of Mr. Kohout's misconduct by observing that it

---

[29] Notably, the Court found Mr. Kohout converted client funds, including funds from his client trust account that were designated to pay a client's medical bill. *See Kohout Disbarment*, 238 W. Va. at 685, 798 S.E.2d at 209 (discussing Mr. Kohout's conversion of settlement funds, in part, by moving "funds intended for Dynamic Physical Therapy from his client trust account to his operating account, comingling the funds of a third person with his own").

[30] Providing some types of legal services to low income clients may be commendable when done responsibly and in compliance with the Rules of Professional Conduct. However, we emphatically reject Mr. Kohout's assertion that the economic status of his clients excuses his misconduct. A lawyer's duties to clients apply to *all* clients. Misconduct such as conversion and fraudulent billing is no less serious when the victim has little wealth. Whether clients are impoverished or wealthy, misappropriating their funds is a most egregious breach of trust. *See Comm. on Legal Ethics v. Pence*, 216 S.E.2d 236, 239 (W. Va. 1975) ("The proper handling of funds belonging to a client is one of the most important and exacting obligations of an attorney."); Syl. pt. 5, in part, *Law. Disciplinary Couns. v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998) ("This Court, like most courts, proceeds from the general rule that, absent compelling extenuating circumstances, misappropriation or conversion by a lawyer of funds entrusted to his/her care warrants disbarment."). There were no extenuating circumstances in Mr. Kohout's underlying discipline.

arose directly out of his practice of law[,] . . . violated his duty as an officer of the Court, undermined the foundations of the administration of justice, and was clearly inconsistent with the character expected of an attorney. [Mr. Kohout's] underlying offenses pertaining to misappropriation of client funds . . . is infected with deceit and dishonesty. Such conduct reflects adversely on his honesty, trustworthiness and fitness to practice law.[31]

Mr. Kohout's misconduct was extensive. He committed fifteen acts that affected three separate clients and violated eleven different provisions of the Rules of Professional Conduct. Four of Mr. Kohout's offenses involved dishonesty, fraud, deceit, or misrepresentation, which is the type of misconduct that most negatively impacts the public's confidence in the legal profession. Indeed, "no single transgression reflects more negatively on the legal profession than a lie. . . . Respect for our profession is diminished with every deceitful act of a lawyer." *Law. Disciplinary Bd. v. Curnutte*, 243 W. Va. 617,

---

[31] The Hearing Panel found that Mr. Kohout's conduct involved "moral turpitude." However, this Court abandoned the concept of "moral turpitude" in lawyer disciplinary matters when it initially adopted the West Virginia Rules of Professional Conduct, which became effective on January 1, 1989. *See Comm. on Legal Ethics v. Boettner*, 183 W. Va. 136, 139, 394 S.E.2d 735, 738 (1990) (discussing the American Bar Association's elimination of "moral turpitude" in its model rules and acknowledging that "'moral turpitude' is an elusive concept incapable of precise definition" (quoting *Committee on Legal Ethics v. Six*, 181 W. Va. 52, 54, 380 S.E.2d 219, 221 (1989))). *See also Committee on Legal Ethics v. Scherr*, 149 W. Va. 721, 726, 143 S.E.2d 141, 145 (1965) ("'[M]oral turpitude' . . . has never been clearly defined because of the nature of the term.").

626, 849 S.E.2d 617, 626 (2020) (quoting *Law. Disciplinary Bd. v. Munoz*, 240 W. Va. 42, 51, 807 S.E.2d 290, 299 (2017) (additional quotations and citations omitted)).[32]

The most serious offense involving dishonesty, fraud, deceit, or misrepresentation was Mr. Kohout's wrongful misappropriation and conversion[33] of a client's settlement funds and funds he owed to a third party for payment of the client's medical debt. *See Comm. on Legal Ethics v. Hess*, 186 W. Va. 514, 517, 413 S.E.2d 169, 172 (1991) ("Misappropriation of funds by an attorney . . . is an act infected with deceit and dishonesty and will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction." (quoting *Att'y Grievance Comm'n v. Ezrin*, 312 Md. 603, 608-09, 541 A.2d 966, 969 (1988)).

---

[32] We have further recognized that

The honor of practicing law "does not come without the concomitant responsibilities of truth, candor[,] and honesty[.] . . . [I]t can be said that the presence of these virtues in members of the bar comprises a large portion of the fulcrum upon which the scales of justice rest." *Jones' Case*, 137 N.H. 351, 628 A.2d 254, 259 (1993) (quotation omitted).

*Law. Disciplinary Bd. v. Curnutte*, 243 W. Va. 617, 626, 849 S.E.2d 617, 626 (2020) (quoting *Law. Disciplinary Bd. v. Munoz*, 240 W. Va. 42, 51, 807 S.E.2d 290, 299 (2017)).

[33] "Misappropriation or conversion of money is 'the unauthorized use of entrusted funds for the lawyer's own purpose. It includes temporary use. It also includes use that does not result in personal gain or benefit to the lawyer.'" *Off. of Disciplinary Couns. v. Morgan*, 242 W. Va. 667, 677-78, 839 S.E.2d 145, 155-56 (2020) (quoting *Law. Disciplinary Bd. v. Kupec*, 202 W. Va. 556, 568, 505 S.E.2d 619, 631 (1998)).

Further misconduct of this type involved Mr. Kohout submitting a fraudulent invoice with his notice of an attorney's charging lien, thereby seeking compensation from a client for legal services he did not perform,[34] failing to notify a client that he was filing an appeal, and tendering a worthless check to the Clerk of this Court as payment for a filing fee. During the disciplinary proceedings, Mr. Kohout exacerbated his misconduct involving the worthless check by repeatedly insisting that "his account contained sufficient funds" when he wrote the check, "despite the fact that his bank records clearly reflect[ed] otherwise." *Kohout Disbarment*, 238 W. Va. at 683, 798 S.E.2d at 207. The Court found this response demonstrated "a dishonest motive." *Id.* Mr. Kohout further exhibited dishonesty by knowingly making a false statement when responding to the ODC about one of the underlying complaints.

In addition to the specific offenses involving dishonesty, fraud, deceit, or misrepresentation that led to Mr. Kohout's disbarment, we must also acknowledge that Mr. Kohout has demonstrated a pattern of engaging in this type of conduct. In an earlier disciplinary action that resulted in Mr. Kohout's law license being suspended, the Court found he had "engaged in serious ethical misconduct and has demonstrated a pattern of

---

[34] The Court has recognized that "[b]oth the statutory and common law of this State have long recognized an attorney's right to recover his/her unpaid fees by way of a charging lien." *Trickett v. Laurita*, 223 W. Va. 357, 364, 674 S.E.2d 218, 225 (2009). "Correspondingly, '[a]n attorney has no lien upon a fund which he is not instrumental in creating, and which never came to his hands.'" *Id.* at 365, 674 S.E.2d at 226 (quoting Syl. pt. 4, *Schmertz & Co. v. Hammond*, 51 W. Va. 408, 41 S.E. 184 (1902)).

conduct involving intentional deception." *Law. Disciplinary Bd. v. Kohout*, No. 22629, at 8 (W. Va. Apr. 14, 1995) (per curiam). Based on his history and the misconduct underlying his disbarment, the Court once again found that Mr. Kohout "established a pattern of harmful conduct that this Court cannot minimize." *Kohout Disbarment*, 238 W. Va. at 687, 798 S.E.2d at 211.

Mr. Kohout's remaining misconduct that led to his disbarment related to the client-lawyer relationship, primarily his failure to keep client funds separate from his own and his failure to properly account for client funds. He charged one client an unreasonable fee and did not promptly pay a medical bill from settlement proceeds. Also included in this class of misconduct was Mr. Kohout's repeated lack of proper communication with clients by failing to obtain client permission for certain actions, keep clients properly informed, and respond to a client's reasonable requests for information. The Court described the nature these offenses when it annulled Mr. Kohout's law license, explaining that he "violated duties owed to a number of his clients . . . and to a third party"; "acted intentionally, knowingly, and with a dishonest motive"; and caused a "great" amount of injury to his clients." *Id.* at 685, 798 S.E.2d at 209.

The offenses underlying Mr. Kohout's disbarment are serious, extensive, and include intentional acts of dishonesty, fraud, deceit, and misrepresentation. When considered along with his lengthy disciplinary record, Mr. Kohout's actions establish a

long-standing pattern of ethical misconduct involving intentional deception that reflects a lack of integrity and moral character. For this reason, Mr. Kohout bears a heavy burden to establish that he has perceived and rejected the wrongfulness of his misconduct, and to show that he has fostered a correct sense of professional responsibility. To meet this burden, Mr. Kohout must provide clear and convincing evidence that he has identified the issues that led to his disbarment and has taken steps to address them. Mr. Kohout's failure to meet his burden is highlighted by our discussion of the evidence in addressing the remaining *Brown II* factors.

### C. Mr. Kohout's Character, Maturity, and Experience When Disbarred

In considering a disbarred lawyer's character, maturity, and experience when disbarred, we differentiate between the conduct of younger, less experienced attorneys and that of attorneys with more experience and sophistication. *See Brown II*, 166 W. Va. at 235, 273 S.E.2d at 572 (commenting that considering "the maturity and experience of the practitioner at the time of his disbarment" in relation to reinstatement is "a recognition that a youthful and inexperienced attorney may have blundered as a result of inexperience rather than as a result of deliberate calculation"); *In re Smith*, 214 W. Va. 83, 88, 585 S.E.2d 602, 607 (1980) ("The criteria of character, maturity, and experience are basically designed to permit forgiveness of a young man who has been stupid in his youth and can demonstrate that over the course of years he has become wiser and stronger."). Mr. Kohout asserts that

27

the best evidence of his character is the lack of complaints about his character from judges, lawyers, and clients. The Disciplinary Board does not comment on this factor.[35]

Regarding Mr. Kohout's character, the opinion annulling Mr. Kohout's law license reflects that, at that time, Mr. Kohout "violated duties owed to a number of his clients . . . and to a third party," and did so "intentionally, knowingly, and with a dishonest motive," a "selfish motive," or both. *Kohout Disbarment*, 238 W. Va. at 685-86, 798 S.E.2d at 209-10. Furthermore, Mr. Kohout refused to "acknowledge the wrongful nature of his conduct or the extent of the harm" he caused,[36] was indifferent about making restitution, and showed no remorse. *Id.* at 686-87, 798 S.E.2d at 210-11. The Court observed that Mr. Kohout's disclosures to the ODC during the disciplinary proceedings "were less than 'full and free,'" and he made "multiple false statements to the ODC and ultimately this Court."

---

[35] During his reinstatement hearing, Mr. Kohout expressed frustration that the ODC continues to raise his prior misconduct in these proceedings, including conduct that occurred while he was in law school in the late 1970s, forcing him to continually answer for his youthful poor judgment. While the depth of the ODC's review of Mr. Kohout's disciplinary history could have been more tempered, given that his history is a matter of record, Mr. Kohout must understand that as long as he continues to perpetuate his well-established pattern of intentionally deceitful and dishonest behavior, his past misdeeds, which are entangled with his prior misconduct as a lawyer, will continue to be relevant considerations in disciplinary proceedings.

[36] The Court found that "[t]he amount of actual injury in this case is great," acknowledging that, at that time, "Mr. Kohout still retain[ed] thousands of dollars that [he] should have . . . disbursed to Ms. Richard over three years ago. By failing to pay the Dynamic Physical Therapy bill when due, Mr. Kohout also put Ms. Richard's credit at risk." *Kohout Disbarment*, 238 W. Va. at 685, 798 S.E.2d at 209.

28

*Id.* at 687, 798 S.E.2d at 211. Finally, the Court concluded that Mr. Kohout's entire record of disciplinary offenses "established a pattern of harmful conduct," and a "general disregard for personal integrity and the honor of the legal profession." *Id.*[37]

Mr. Kohout was admitted to the West Virginia Bar in 1987, and at the time of his 2016 disbarment he had practiced law in West Virginia for nearly eighteen nonconsecutive years. Following his admission, Mr. Kohout worked several years at two law firms, but he has spent most of his legal career as a solo practitioner. His license was suspended in 1995, after he had practiced for about seven-and-one-half years. Then, after his license was reinstated in 2005, he practiced around ten more years before his license was annulled. Mr. Kohout's years of experience, most of which he spent operating his own law firm, are substantial.

Mr. Kohout's dishonest and deceitful character described above, which developed into a long-standing pattern of intentional misconduct, combined with his failure to accept responsibility for his actions and lack of remorse, provide no basis for attributing the misconduct underlying his disbarment to inexperience or mistake. Rather, given his

---

[37] *See supra* note 3 for Mr. Kohout's prior lawyer disciplinary actions. *See also* W. Va. R. Prof. Conduct 3.30 (requiring that a person's prior and subsequent conduct be considered in determining "good moral character and fitness"); *Brown II*, 166 W. Va. at 239, 273 S.E.2d at 574 ("[W]e do not view the inquiry on reinstatement as limited to the single issue of the precise offense that triggered disbarment. Most courts have concluded that applicant's prior and present record of infractions can be considered.").

lengthy disciplinary record and years of practice, Mr. Kohout should, by now, have a thorough understanding of the high moral standards and integrity required of those who are granted the privilege to practice law. Therefore, this factor weighs against reinstating Mr. Kohout's law license.

### D. Mr. Kohout's Occupations and Conduct Since Disbarment

A disbarred lawyer's occupations and conduct after disbarment give insight into the person's efforts toward rehabilitation and objective information pertinent to the level of success produced by those efforts. *See Brown II*, 166 W. Va. at 235, 273 S.E.2d at 572 (stating that "the applicant's activity and conduct since the date of his disbarment," is an "important area of inquiry . . . since it is upon this objective record that good character must be judged"). This factor is vital because "the original disbarment stands as a finding that the attorney has committed a serious breach of professional obligations . . . and this fact continues to demonstrate a lack of fitness to practice law." *Id.* at 233-34, 273 S.E.2d at 571 (stating further that, "[a]s a consequence, there is a burden on [the person] who seeks reinstatement to overcome this finding of lack of fitness"); s*ee also Moore*, 214 W. Va. at 788, 591 S.E.2d at 346 ("The judgment of disbarment continues to be evidence against the applicant and [the disbarred lawyer] may overcome it only by most persuasive proof." (quoting *Lester*, 532 S.W.2d at 436)).

We have explained that "[r]ehabilitation is demonstrated by a course of conduct that enables the [C]ourt to conclude there is little likelihood that[,] after such rehabilitation is completed and the applicant is readmitted to the practice of law[,] he will engage in unprofessional conduct." Syl. pt. 4, *Wheaton*, 245 W. Va. 199, 858 S.E.2d 662 (quoting Syl. pt. 2, *Brown II*, 166 W. Va. 226, 273 S.E.2d 567). *See also* Syl. pt. 1, in part, *In re Smith*, 214 W. Va. 83, 585 S.E.2d 602 (explaining that, in the context of our consideration of a petition to reinstate an annulled law license "the word 'rehabilitation' means a course of conduct since disbarment which leads the Court to conclude that the public is adequately protected."); *see also Arrotta*, 96 P.3d at 216 ("the bottom line must always be whether the applicant has 'affirmatively shown that he has overcome those weaknesses that produced his earlier misconduct,' *i.e.*, whether he has been rehabilitated." (emphasis omitted) (quoting *In re Robbins*, 836 P.2d 965, 966 (1992))).

When evaluating a disbarred lawyer's rehabilitation we use a flexible approach. Rather than framing rehabilitation "around a set of specific principles," our analysis "will vary depending on the particular facts of a given case." *Brown II* at 234, 273 S.E.2d at 571. Addressing the type of proof required, an Arizona court has observed that

> When a disbarred lawyer seeks readmission to the bar, particularly when disbarment resulted from [egregious] conduct . . . he must demonstrate more than that he has led a blameless and law-abiding life while disbarred. "Merely showing that [an individual] is now living and doing those things he . . . should have done throughout life, although necessary to prove rehabilitation," is not sufficient to meet the

31

applicant's burden. . . . In addition, he must bring forth clear and convincing evidence showing the positive actions he has taken to overcome the weaknesses that led to his disbarment.

*Arrotta*, 96 P.3d at 219 (quoting *In re J.J.T.*, 761 So. 2d 1094, 1096 (Fla. 2000) (per curiam)). As we concluded above, Mr. Kohout's burden of proving his rehabilitation is a heavy one because of his long-standing pattern of ethical misconduct involving intentional deception that reflects a lack of integrity and moral character.

Mr. Kohout asserts that his conduct since disbarment "is unassailable." To support this declaration, he relies only on his current employment, pointing out that he "has been successfully selling insurance to the public under [a] state license," handling over 500 cases "without complaint," and has been "tested annually by Medicare." He does not explain how this employment has aided him in resolving the various issues that led to his disbarment. The Disciplinary Board contends that since his disbarment, Mr. Kohout has "publicly displayed hatred, disrespect[,] and disregard for the ODC and the [Judicial Investigation Commission]," which "demonstrates a lack of judgment, moral character[,] and integrity." The Disciplinary Board suggests that Mr. Kohout's demonstrated animosity toward the disciplinary process "raises a serious concern as to whether . . . he would adhere" to the Rules of Professional Conduct if reinstated.

While we agree that the letter and testimony from Mr. Kohout's employer is positive in describing him generally as a good insurance sales agent, that evidence falls far

short of proving his rehabilitation, particularly as it relates to money management. At his reinstatement hearing, Mr. Kohout testified that there is "no functional difference between selling insurance and practicing law in terms of dealing with the public" and stated that he had "handled money" and "people's checks." Yet, other testimony established, to the contrary, that Mr. Kohout's duties did not provide him with access to customer funds. Similarly, the letter from Mr. Hernandez describing Mr. Kohout's service as the secretary for a gun club is laudable.[38] However, even taken together with the information about Mr. Kohout's employment, this evidence is insufficient to show that Mr. Kohout is now able to handle client funds or that he has overcome the problems that led to his disbarment.

We turn now to more direct evidence of Mr. Kohout's post-disbarment conduct. Initially, Mr. Kohout failed to timely comply with his mandatory obligation to, within twenty days after disbarment, file an affidavit with this Court providing information about each client he was required to notify about his disbarment. *See* W. Va. R. Law. Disciplinary P. 3.28(c).[39] He did not file the required affidavit until May 18, 2020–nearly

---

[38] We note that this letter does not indicate whether Mr. Hernandez knew the details of Mr. Kohout's disciplinary problems. *See Drake*, 242 W. Va. at 71, 829 S.E.2d at 273 (expressing concern over personal opinions about a disbarred lawyer's character or legal competence that are provided by persons who do not fully understand the offenses underlying the disbarment).

[39] Lawyer Disciplinary Procedure Rule 3.28(c) provides, in relevant part, that,

33

three-and-a-half years later. Notably, noncompliance with Rule 3.28(c) is a serious offense that may warrant annulment of a suspended law license. *See* Syl. pt. 7, *Law. Disciplinary Bd. v. Hart*, 241 W. Va. 69, 818 S.E.2d 895 (2018) ("A suspended attorney who fails to comply with the provisions of [Rule 3.28 of the Rules of Lawyer Disciplinary Procedure] may have his [or her] license to practice law annulled upon proof by the [Office of Disciplinary Counsel] of the West Virginia State Bar by [clear and convincing] evidence that the suspended attorney failed to comply with the provisions." (quoting Syl. pt. 3, *Comm. on Legal Ethics v. Keenan*, 192 W. Va. 90, 450 S.E.2d 787 (1994))).

It also appears that Mr. Kohout gave little thought to complying with this Court's directions accompanying his disbarment until the time approached when he could petition for reinstatement. Mr. Kohout's license was annulled in December 2016, and he

---

Within twenty days after the effective date of the disbarment or suspension order, the lawyer shall file under seal with the Supreme Court of Appeals an affidavit showing (1) the names of each client being represented in pending matters who were notified pursuant to subsections (a) and (b); (2) a copy of each letter of notification which was sent; (3) a list of fees and expenses paid by each client and whether escrowed funds have been or need to be reimbursed; and (4) an accounting of all trust money held by the lawyer on the date the disbarment or suspension order was issued. Such affidavit shall also set forth the residence or other address of the disbarred or suspended lawyer where communications may thereafter be directed and a list of all other courts and jurisdictions in which the disbarred or suspended lawyer is admitted to practice. A copy of this report shall also be filed with the Office of Disciplinary Counsel.

34

was ordered to make full restitution to Ms. Richard and to pay the costs of the disciplinary proceedings.[40] Yet he did not pay Ms. Richard until September 2021, less than two months before he filed his petition for reinstatement. He first contacted the ODC about paying the costs of his disciplinary proceeding in mid-December 2021, mere days before filing his petition for reinstatement, and did not make his first payment for several more weeks. He executed a repayment plan with the ODC, but he quickly defaulted on that plan and then made only sporadic payments.

However, as the date for oral arguments in this proceeding neared, Mr. Kohout began making more regular payments—an apparent effort to generate evidence that he was finally complying with the Court's order to pay those costs so we might reinstate with a requirement for continued payments. *See, e.g.*, *Wheaton*, 245 W. Va. 199, 858 S.E.2d 662 (reinstating annulled license where petitioner executed payment plans for outstanding bankruptcy judgment and costs owed to Disciplinary Board and began making payments according to the plans, all while his request for reinstatement was pending);[41]

---

[40] Mr. Kohout also has not paid any of the costs of his judicial disciplinary proceeding. The Court's order resolving that matter directed Mr. Kohout to begin making payments thirty days from the date of the Court's order, which was October 7, 2016. *See In re Kohout*, No. 15-1190 (W. Va. October 7, 2016) (unpublished order).

[41] *Wheaton* is distinguishable from this case. Once Mr. Wheaton executed a payment plant to reimburse the Disciplinary Board, he made payments in accordance with that plan. *In re Reinstatement of Wheaton*, 245 W. Va. 199, 208, 858 S.E.2d 662, 671 (2021). Mr. Kohout quickly defaulted on his payment plan, and thereafter made irregular payments of a lesser amount than he had agreed to.

*Law. Disciplinary Bd. v. Vieweg*, 194 W. Va. 554, 461 S.E.2d 60 (1995) (reinstating disbarred lawyer while he was in the process of repaying substantial debts).[42] We find Mr. Kohout's circumstances are more like those reflected in *In re Reinstatement of Drake*, 242 W. Va. 65, 829 S.E.2d 267 (2019). Mr. Drake failed to make restitution during the seven years prior to his petition for reinstatement and did not even seek information about where to send those payments until a few weeks before oral argument on his petition for reinstatement. The Court concluded that "Mr. Drake did not prioritize restitution and did not exercise reasonable and diligent efforts to fulfill these obligations until he came before this Court seeking reinstatement of his law license." *Id.* at 71, 829 S.E.2d at 273. Like Mr. Kohout, Mr. Drake also tried to justify and downplay his misconduct.

In addition to delaying his compliance with Rule 3.28 and the Court's directions, Mr. Kohout has shown no initiative to critically examine his actions to identify the root cause for his misconduct so that he could work toward a remedy. *See Moore*, 214 W. Va. at 788, 591 S.E.2d at 346 ("[R]ehabilitation and reformation demand that the individual . . . show in some positive way that he now has a correct sense of professional

---

[42] The *Vieweg* opinion does not give details about Mr. Vieweg's repayment efforts, but the Court did take note that Mr. Vieweg was forthright in admitting his misconduct and had discussed it with some of his victims. He also presented testimony from law firm and state agency employers who commented favorably about his integrity, legal competence, and rehabilitation from alcoholism, indicating that petitioner's rehabilitation would inspire others. *Law. Disciplinary Bd. v. Vieweg*, 194 W. Va. 554, 461 S.E.2d 60 (1995).

responsibility." (emphasis omitted) (quoting *Peterson*, 274 N.W.2d at 926)); *Arrotta*, 96 P.3d at 217 ("To show rehabilitation, an applicant must first establish by clear and convincing evidence that he has identified just what weaknesses caused the misconduct and then demonstrate that he has overcome those weaknesses."). Mr. Kohout did not even attempt to remedy the one excuse he has offered.[43] Even though Mr. Kohout has maintained throughout these proceedings that this case is only about the fact that "the money ran out," he has not produced evidence of any effort to improve his money management skills. In fact, not only has Mr. Kohout failed to fully satisfy the payments ordered by this Court in his disbarment proceeding and in the judicial discipline proceeding, but his testimony about his household finances reveals that properly managing his money continues to be a challenge.

Thus, we perceive little evidence that Mr. Kohout has recognized the wrongfulness of his prior conduct. *See Moore*, 214 W. Va. at 788, 591 S.E.2d at 346 (recognizing that an "applicant's recognition of his wrongdoing" is a consideration for reinstatement (emphasis omitted) (quoting *Lester*, 532 S.W.2d at 436)). Rather, he continues to deny or minimize his misconduct, revealing that he has neither rejected the conduct nor developed a correct sense of his professional responsibility. *Id.* Although Mr.

---

[43] Mr. Kohout demonstrated his resistance to rehabilitation during his reinstatement hearing, when he stated "look, I'm not going to act like a lawyer when I'm not permitted to practice law. That's absurd. That's that's [sic] Kafkaesque."

Kohout professes to have accepted responsibility for his transgressions and claims remorse, his testimony during the Hearing Panel's reinstatement hearing and his brief to this Court in support of his reinstatement demonstrate otherwise. During his lengthy testimony before the Hearing Panel, Mr. Kohout attempted to minimize his wrongdoing by repeatedly characterizing this case as being only about a loss of money. He made comments such as: "I ran out of money. That's it, and that's where all these ethics cases came from," and "[i]n this ethics [c]ase, all of these complaints and statement of charges stemmed from losing money, losing the finances and lose—the money ran out. The money ran out. That's all there was to it." He repeats this refrain in his brief. Mr. Kohout's characterization of his misconduct as being solely due to running out of money demonstrates his profound misunderstanding or willful denial of the conduct that led to his disbarment.

Mr. Kohout continues to deny committing multiple acts of misconduct, arguing that this Court's conclusions were wrong and attempting to discredit witnesses, despite this Court's final resolution of these matters in Mr. Kohout's prior disciplinary proceeding.[44] These responses not only show Mr. Kohout's disregard for the proceedings that led to the annulment of his license, but also that Mr. Kohout has not accepted

---

[44] *Cf. Law. Disciplinary Bd. v. Macia*, 246 W. Va. 317, 324, 873 S.E.2d 848, 855 (2022) ("[T]he general rule is that when a question has been definitively determined by this Court its decision is conclusive on parties, privies and courts, including this Court, upon a second appeal and it is regarded as the law of the case." (quoting Syl. pt. 1, *Mullins v. Green*, 145 W. Va. 469, 115 S.E.2d 320 (1960))).

responsibility for his misdeeds and lacks remorse for them. For example, Mr. Kohout denied using a worthless check to pay the filing fee for an appeal, testifying "[w]hen I wrote that check, it was good. They held on [sic] it for six weeks. They held onto that check for six weeks. For six weeks." When cross-examined, he stated the following:

> Q. Right. Okay. Well, here's what the Supreme Court found. . . . So the check—so the [C]ourt found that the check written to the court was—was worthless when written.
>
> A. That's not true.
>
> Q. That's—that's what the [C]ourt found.
>
> A. Well, they're wrong.

He likewise rejected the conclusion that, by retaining client settlement funds and using them to pay his firm's expenses, he committed conversion:

> Now—now, this really galls me that that—that the ODC or the Hearing Panel or the Supreme Court would say that this was a conversion [c]ase. Okay, the facts are what they are, and I admit to them. But if you look at my disbursements for all of my cases, you will see my clients always got more money than I did. Always.

Mr. Kohout justified this misconduct by explaining "[i]f I had paid [the client] the extra $2,000 and if I had paid the $985 medical bill, that's another $3,000 that doesn't go into paying [employee salaries] and we would have been broke, and I would have closed the office[.]"[45]

---

[45] Mr. Kohout's apparent belief that keeping settlement funds that belonged to his client is neither unethical nor a conversion of client funds so long as the client

When questioned about failing to obtain a client's permission before filing an appeal, Mr. Kohout denied this conduct too:

> [Q]    They [the Supreme Court of Appeals] found that you had not received your client's permission to file the appeal to the [C]ourt in the Big Bear Camplands [matter].
>
> A.    That's not true either.

And, in his brief to this Court, Mr. Kohout denies submitting a fraudulent invoice with his notice of attorney's charging lien against his client and former employee Mr. Ronald "Ron" Kramer, II, declaring "[t]here was NO 'fraudulent charging lien' filed in Kramer's car case," and incorrectly stating that "[t]he only evidence of a 'fraudulent charging lien' presented at the original ethics hearing in January 2016 was Kramer's own false assertion."[46] Thus, even though this Court has conclusively determined that Mr. Kohout filed a fraudulent charging lien, he continues to attack Mr. Kramer's credibility. Mr. Kohout similarly accused another former employee of lying when she testified before the

---

received more of the settlement than he did, or he needed the funds to meet his expenses, demonstrates that he still does not comprehend the rules related to fees and client funds, or the negative impact ignoring these rules has on the public's perception of the legal profession.

[46] *See Kohout Disbarment*, 238 W. Va. at 684, 798 S.E.2d at 208 ("Despite Mr. Kohout's testimony to the contrary, email correspondence included in the record shows that he acknowledged receipt of a discovery document drafted by Mr. Kramer and his assertion that it would be filed exactly as it was written. We find that based on the evidence in the record, there is clear and convincing evidence that Mr. Kohout submitted a lien asserting he was owed money for work that he did not perform.").

Hearing Panel, claiming "[s]he's still angry with me. I did insult her there, which, you know, I'm just so upset with these people."[47]

During the time since his disbarment, Mr. Kohout has engaged in conduct that demonstrates a grim lack of integrity and moral character. An egregious example of this type of conduct occurred after Mr. Kohout's reinstatement hearing before the Hearing Panel. The ODC subpoenaed Mr. Kramer to testify at the hearing. Subsequently, Mr. Kramer notified the ODC that Mr. Kohout left the following message on Mr. Kramer's law firm website at 3:14 am on May 18, 2024, the morning after Mr. Kramer testified before the Hearing Panel:

> [Y]ou're a disposable person Ron. You're a liar and vindictive, deceitful and conniving. And a fraud. You didn't accomplish a thing yesterday. I just still cannot understand why you and KT [another former employee] continue to stalk me and try to hurt me. It's been ten years! When will your hate ever end? You're no Marine! You may have served in the Corps, but you are without honor. I would love to see your service record. Varner was so glad you left. Your day will come.

Before the Hearing Panel's hearing, Mr. Kramer had not seen or spoken to Mr. Kohout since his disciplinary hearing in 2016.

---

[47] The insult Mr. Kohout references is likely his comment "[l]ooks like you've gained some weight since we spoke last time; is that true?" which he made immediately after greeting the witness at the beginning of his cross examination.

Mr. Kohout has also publicly portrayed the ODC as stupid, incompetent, corrupt, and malevolent. Examples of this publicly expressed contempt for the ODC and the lawyer disciplinary process include a July 2017 narrative titled "My Story: Practicing Law in West Virginia," that he published online. In this writing, Mr. Kohout contradicted conclusions related to his rule violations, which this Court found to be proven by clear and convincing evidence, and accused the ODC of exaggerating the case, misstating the facts, and pursuing "a vendetta." He further claimed that the Hearing Panel "made no independent finding[s]," the Court's opinion "was like a virtual rubber stamp," and West Virginia's legal system "is broken and corrupt." On another occasion, in April 2018, Mr. Kohout commented on Facebook post by the West Virginia Record reporting on Dante diTrapano's petition for reinstatement. Mr. Kohout wrote, in part:

> The people have no idea how corrupt and stupid and unfair the lawyer disciplinary process is. . . . First of all, the women (and it's all women) running the ODC are stupid, incompetent, corrupt and lazy. And they play favorites. They go after Lawyers they don't like. They go after lawyers whom they're told to go after. They couldn't find their fat a\*\*\*\* with both hands. They are pure evil. They are puppets of the [Supreme Court of Appeals] and the big law firms. They are not doing their job properly and they don't care one bit about the "public" whom they claim to be protecting. Someone needs to be protecting the public and the Bar from these stupid evil b\*\*\*\*\*!

Although Mr. Kohout attributes these comments to the past "when [he] was very angry one time, and during a terrible period in [his] . . . life when [he] was in the depths of [his] despair," he continued to disparage the disciplinary process during this reinstatement

42

proceeding. For example, before the Hearing Panel, he alleged that in disciplinary proceedings, "the ODC does all the talking," and the "investigative panel doesn't investigate anything. They're like magistrates that rubber stamp complaints brought in by police officers. They don't investigate anything." Likewise, he asserted that "it's always the ODC's version of everything" and implied that neither the Hearing Panel nor this Court made independent findings in disciplinary actions.[48] He made similar, though tempered comments in his briefing to this Court, averring that the "false idea" that he is unfit to

---

[48] Mr. Kohout defends his comments by asserting that lawyers have a public duty to criticize the legal system and citing *In re Sawyer*, 360 U.S. 622, 631, 79 S. Ct. 1376, 1380, 3 L. Ed. 2d 1473 (1959), which states that "lawyers are free to criticize the state of the law." In *Sawyer* the Supreme Court of the Territory of Hawaii found Ms. Sawyer, a lawyer serving as one of the defense counsel in a federal Smith Act case, was guilty of violating Canons 1 (duty of the lawyer to the courts) and 22 (candor and fairness) of the ABA Canons of Professional Ethics, by engaging in speech that reflected adversely upon the trial judge's "impartiality and fairness in the conduct of the Smith Act trial and impugned his judicial integrity." *Id.* at 624-25, 79 S. Ct. at 1377, 3 L. Ed. 2d 1473. The Hawaii court suspended Ms. Sawyer's license for one year and the Ninth Circuit affirmed. The Supreme Court of the United States reversed. It characterized Ms. Sawyer's comments as "voicing strong criticism of Smith Act cases and the Government's manner of proving them," and said they were "not a reflection in any wise upon [the trial judge] personally or his conduct of the trial." *Id.* at 628, 79 S Ct. at 1379, 3 L. Ed. 2d 1473. Notably, the Court specifically found that Ms. Sawyer's speech could not "be equated with an attack on the motivation or the integrity or the competence of the judges." *Id.* at 632, 79 S. Ct. at 1381, 3 L. Ed. 2d 1473. Mr. Kohout's reliance on *Sawyer* is misplaced. The issue in *Sawyer*, addressing a lawyer's alleged violation of ethical cannons by impugning a judge's integrity, is entirely different from the question currently before this Court, i.e., whether Mr. Kohout presently possesses the integrity and moral character to overcome his disbarment and be restored to the practice law. Moreover, Mr. Kohout's criticisms were an attack on the ODC's motivation and competence, and on the integrity of the ODC and the entire disciplinary process, thus it is not the type of protected speech the *Sawyer* Court addressed.

practice law "is emanating solely from the bruised and vindictive ego of the ODC," and is a "phantom charge . . . born entirely from the ego of the ODC."

Mr. Kohout has failed to present sufficient evidence that his occupations and conduct since disbarment demonstrate a level of rehabilitation, integrity, and moral character to warrant reinstating his license to practice law. His burden to establish rehabilitation is a heavy one because his prior misconduct was serious, and he has a long-established pattern of intentional deceit and dishonesty to courts and his clients. To meet this burden, Mr. Kohout relied on his work as an insurance agent; however, this work history does not provide evidence demonstrating that Mr. Kohout has developed skills that diminish the risk that he will engage unethical behavior if reinstated to the practice of law. Furthermore, Mr. Kohout's evidence of accepting responsibility and being remorseful for his misconduct is limited to his own self-serving statements, and these statements are contradicted by his continued declarations of innocence. Finally, Mr. Kohout's repeated attacks on the veracity, motivations, and competence of complainants, witnesses, the ODC, and the entire lawyer disciplinary process reveal that he has not achieved the integrity and moral character required to practice law.[49] Accordingly, Mr. Kohout's occupation and

---

[49] Mr. Kohout argues that to be fair and consistent, we must compare his case with *Wheaton*, 245 W. Va. 199, 858 S.E.2d 662, and *diTrapano*, 240 W. Va. 612, 814 S.E.2d 275. He contends that this case does not involve criminal behavior or felony convictions, and implies that his law license should be reinstated as Mr. Wheaton's and Mr. diTrapano's were. In both *Wheaton* and *diTrapano* the disbarred lawyers' first

conduct since disbarment do little to satisfy his burden to show that the Court should reinstate his license to practice law.

### E. Time Elapsed since Mr. Kohout's Disbarment

The Court has made clear that, "the mere passage of time alone is insufficient to warrant reinstatement." *Brown II*, 166 W. Va. at 235, 273 S.E.2d at 572. However, "[m]any reasons can be seen for considering . . . the passage of time in evaluating a petition for reinstatement from disbarment." *Moore*, 214 W. Va. at 793, 591 S.E.2d at 351. For instance, "[t]ime may bring greater maturity than at the time of the misconduct," and "may give an opportunity for a person to recognize, address, and overcome the circumstances and conditions that led to the misconduct[.]" *Id.* Additionally, "time may reduce the perception of the misconduct's gravity, perhaps because of changing mores or by placing the conduct in a historical perspective." *Id. See also Brown II*, 166 W. Va. at 235, 273 S.E.2d at 572 (stating "[t]ime provides the applicant [for reinstatement] an opportunity to build a record of good character and integrity"). Mr. Kohout submits that he has endured eight years of disbarment and his "suffering during those eight years has been substantial"

---

petitions for reinstatement were denied. In making his argument, Mr. Kohout fails to recognize that in connection with their second, successful petitions for reinstatement, Mr. Wheaton and Mr. diTrapano did not minimize and deny their wrongdoing in the face of this Court's conclusive findings of such misconduct, they did not attempt to discredit or verbally attack witnesses or complainants, and they did not demonstrate contempt for disciplinary officials and proceedings. Therefore, comparing this case with *Wheaton* and *diTrapano* does not persuade us to reinstate Mr. Kohout's license.

in that he has "lost his home, his credit, his income, his ability to land a decent job, his reputation," and his marriage. The Disciplinary Board does not address this issue.

Mr. Kohout's focus on the consequences he has purportedly suffered because of his unethical behavior is misplaced. While eight years is an ample amount of time to demonstrate some level of rehabilitation and progress toward developing the level of character and integrity required in the practice of law, the record Mr. Kohout has produced reveals his ineffective use of those eight years. Mr. Kohout made no attempt during that time to identify and address the circumstances and conditions that led to his misconduct or "to build a record of good character and integrity." *Brown II*, 166 W. Va. at 235, 273 S.E.2d at 572. Rather, Mr. Kohout stated "from December of '16 until December of '21, I've been waiting. I've been waiting." He did not engage in any form of counseling during this time due to the cost and because he had participated in counseling when his law license was suspended in an earlier disciplinary proceeding. According to Mr. Kohout, he thought the counseling "was a bunch of nonsense," and the counselor "couldn't find anything wrong with [him]." Neither did Mr. Kohout pursue any form of training or engage in any civic or volunteer activities that might have fostered personal growth. Although Mr. Kohout declares his strong desire to help others, he has engaged in no voluntary activities that would allow him to fulfill this desire without personal gain. Finally, during this time he failed to prioritize repaying the costs of the disciplinary proceedings or making restitution to his client as ordered by this Court, addressing these debts only when the date he could

first petition for reinstatement was near. For these reasons, the amount of time since Mr. Kohout's disbarment does not weigh in his favor.

### *F. Present Competence and Legal Skills*

Mr. Kohout contends that the ODC has not questioned his competence and legal skill, "they just do not like him." The Disciplinary Board does not address this issue. Nevertheless, Mr. Kohout has tendered no evidence to indicate that, during the eight years since his disbarment, he has made an effort to remain abreast of the law. He only recently began to participate in continuing legal education courses. Mr. Kohout supplemented the record for this case with a copy of his CLE transcript covering the 2024-2026 reporting period. The transcript shows that he received credit for twelve hours of CLE, including ten hours of legal ethics, by completing fourteen hours of pre-recorded CLE courses all in the same day—January 27, 2025. He received credit for only twelve hours because that is the credit limit for pre-recorded presentations. We give little rehabilitative value to completing fourteen hours of pre-recorded CLE in a single day. Other evidence of Mr. Kohout's competence and legal skills is comprised mostly of letters that were either written before his disbarment, some as long ago as 1995, or that discuss his pre-disbarment competence. Because of the absence of evidence reflecting Mr. Kohout's present competence and legal skill, this factor does not weigh in Mr. Kohout's favor.

### G. Public Confidence in the Administration of Justice

Engaging in the practice of law is a privilege. In exchange for this privilege lawyers owe certain duties to the public, the courts, and the legal profession:

> A lawyer owes an ethical duty to clients including the duty of candor, loyalty, diligence, and competence. Lawyers also owe duties to the public who rely on lawyers to protect their interests. The general public deserves lawyers with the highest standards of honesty and integrity. As officers of the court, lawyers owe duties to the legal system whereby they must conduct themselves within the bounds of the law and abide by the rules of substance and procedure which afford the administration of justice. As to the legal profession, lawyers owe an ethical duty to maintain the integrity of the profession.

*Law. Disciplinary Bd. v. Blyler*, 237 W. Va. 325, 341, 787 S.E.2d 596, 612 (2016). When a lawyer engages in misconduct, the harm extends beyond the affected clients and impacts public confidence in the administration of justice. *See Smith*, 214 W. Va. at 93, 585 S.E.2d at 612 (Miller, J., dissenting) ("It is a lawyer's obligation to participate in upholding the integrity, dignity, and purity of the courts. He owes a definite responsibility to the public in the proper administration of justice. It is of utmost importance that the honor and integrity of the legal profession should be preserved and that the lives of its members be without reproach." (quoting *In re Stump*, 114 S.W.2d 1094, 1097 (Ky. 1938)). Therefore, protecting the public and the legal profession are essential elements of lawyer disciplinary proceedings. *See* Syl. pt. 2, *In re Daniel*, 153 W. Va. 839, 173 S.E.2d 153 (1970) ("Disbarment of an attorney to practice law is not used solely to punish the attorney but is for the protection of the public and the profession.").

Our discussion of the five factors used to evaluate a petition for reinstatement demonstrate that Mr. Kohout has failed to carry his heavy burden of proving, by clear and convincing evidence, that he possesses the integrity, moral character, and legal competence necessary to resume the practice of law. This lack of evidence prevents us from reaching the mandatory conclusion that his reinstatement will not have a substantial adverse effect on the public confidence in the administration of justice, and we must deny Mr. Kohout's petition for reinstatement.

When we deny a petition for reinstatement, Rule 3.33(g) of the Rules of Lawyer Disciplinary Procedure authorizes us to impose conditions concerning subsequent petitions.[50] Because Mr. Kohout did not exercise reasonable diligence in reimbursing the Disciplinary Board for the costs of his underlying disciplinary proceeding, we impose the condition that Mr. Kohout may not further petition for reinstatement of his license to practice law before he has reimbursed the Disciplinary Board, in full, for the costs incurred in the proceeding that resulted in Mr. Kohout's disbarment as well as the costs incurred in

---

[50] Rule of Lawyer Disciplinary Procedure 3.33(g) provides:

> If the petition is withdrawn or is denied, the Court may enter an order of judgment requiring the petitioner to reimburse the Office of Disciplinary Counsel for the ordinary and necessary costs expended in connection with the petition for reinstatement. The Court may include in any order denying reinstatement any terms and conditions concerning subsequent petitions, including time restrictions concerning filing, as the Court may deem just.

49

this reinstatement proceeding. In addition, any future application for reinstatement Mr. Kohout submits must include an affidavit from a licensed attorney agreeing to supervise him upon reinstatement.

## IV.

## CONCLUSION

For the reasons explained in this opinion, we adopt the Hearing Panel's recommendation and deny Mr. Kohout's petition for reinstatement. Additionally, before he files any further petitions for reinstatement, we direct Mr. Kohout to: (1) fully reimburse the Disciplinary Board for the cost of the disciplinary proceeding in which he was disbarred; (2) fully reimburse the Disciplinary Board for the cost of this reinstatement proceeding; and (3) obtain an affidavit from a licensed attorney agreeing to supervise him upon reinstatement, which he must include with any future petition for reinstatement he may file.

Petition Denied.